**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Great West Casualty Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER RE CROSS-MOTIONS** |
| vs. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| National Casualty Company | ) | |
| and Steve Heinis, | ) | |
| | ) | Case No.:  4:13-cv-012 |
| Defendants. | ) | |

_____

In this declaratory action initiated by plaintiff Great West Casualty Company ("Great West"),

the court must decide whether defendant Steve Heinis should be afforded liability coverage by Great

West, by co-defendant National Casualty Company ("National"), or by neither of said insurers, for

an accident that occurred on June 18, 2011, which is the subject of a pending state court action.

Before the court are cross-motions for summary judgment by Great West and National.  Unless

otherwise indicated, the facts are either undisputed or have been construed most favorably for

National.[1]

I.      **INTRODUCTION**

     A.      **Lease of equipment by Heinis to Avery Enterprises**

At the time of the June 18, 2011, accident, Heinis, a South Dakota resident, was working

as a trucker in the oil fields of western North Dakota and eastern Montana, including the prolific

Bakken field.  Heinis owned a 2007 Volvo semi-tractor and a 1977 Trailmobile tanker-trailer that

---

[1]  Heinis has not taken a position on the coverage issues - apparently believing that either Great West or National will be required to provide coverage.

1

he leased to Avery Enterprises, Inc. ("Avery"), a local trucking firm headquartered in Powers Lake, North Dakota, pursuant to a written lease dated April 14, 2011. (Doc. Nos. 20-1, pp. 9-10; 20-2, pp. 4-9; 20-4).

Pursuant to the lease, Heinis had agreed to make his equipment and a driver (which in this case was himself) available to Avery for use in its business of providing trucking services to oil and gas companies operating in western North Dakota and eastern Montana. Specifically, Avery used Heinis and his equipment to haul either fresh water to drill sites for use in drilling operations or to haul contaminated "flowback" or "pit" water from the drill sites to authorized disposal facilities. (Doc. Nos. 20-1, pp. 19-20; 20-2, pp. 12, 21-22; 20-4).

The salient terms of the lease between Heinis (the "lessor") and Avery (the "lessee") were that:

- Heinis agreed to furnish the leased equipment "in good and safe operational condition" and a qualified driver for dispatch by Avery. In addition, the parties agreed the following would constitute a default by Heinis of these obligations:

    1. Failure to remain in constant contact with Lessee's dispatch personnel.

    2. Failure to respond to a dispatched load within a reasonable amount of time.

    3. Failure to maintain a safe working environment.

    4. Failure to maintain the leased equipment in good working condition.

- Heinis would be responsible for the cost of fuel and other consumables (*e.g.*, oil, lubricants, and tires) as well as all repairs and maintenance to the equipment.

- Heinis agreed to abide by all motor carrier safety regulations set forth by the USDOT and "all safety and operating procedures" set forth by Avery.

- For each load hauled by Heinis, Avery agreed to pay Heinis a specified percentage of the amounts invoiced to its customers, provided that Heinis supplied the information required for billing as specified in the agreement.

- Avery agreed to obtain and maintain any licensing and registration of the equipment required by law showing Heinis as the legal owner of the leased equipment.

- Avery agreed to acquire and maintain both "property and casualty insurance" and "fleet cargo and liability insurance" for the leased equipment of at least one million dollars. Heinis agreed to maintain proper and needed insurance, except for that which Avery agreed to obtain.

(Doc. No. 20-4).

Notably, the lease did not authorize Heinis to use the equipment he leased to Avery to haul loads for himself or other carriers during the term of the lease - at least not explicitly. In fact, as noted above, Heinis was obligated to remain in "constant contact" with Avery's dispatcher and respond to dispatched loads within a "reasonable" period of time. In addition, Avery's name was on the tractor during the entire time it was leased to Avery - including the day of the accident. Not surprisingly, Heinis never attempted to use the equipment to haul loads for himself or others while it was under lease to Avery. (Doc. No. 20-1, pp. 10, 18-19, 24).

**B.**     **Purchase of insurance by Avery and Heinis**

As required by the lease, Avery maintained a policy with National that included commercial liability motor carrier coverage for the equipment it leased from Heinis. And, to satisfy his

obligations under the lease, Heinis obtained a "Commercial Lines Policy" from Great West that provided non-trucking liability coverage (sometimes referred to as "bobtail" insurance) for when the equipment was not being used in support of Avery's business.[2] (Doc. Nos. 20-2, p. 9; 25-4; 29-5; 29-6; 29-7).

### C.     The underlying accident and ensuing state court action

On June 16, 2011, Heinis was dispatched by Avery to transport a load of contaminated flowback water from a well site in North Dakota to a disposal facility in eastern Montana. Heinis started out from Williston, North Dakota, where he often stayed while awaiting his next dispatch because of its cental location to where the work was located and the fact it had supporting services, *e.g.*, truck stops and a variety of places to eat.[3] He traveled to the well site where he loaded the flowback water and then to the disposal facility where he unloaded it. He then returned to Williston, arriving during the late evening hours of June 16 or the early morning hours of June 17, which was a Saturday. (Doc. Nos. 20-1, pp. 14-16; 20-2, p. 18-19).

Sometime prior to hauling this load, Heinis noted that there was a small leak on his tanker-trailer during loading and unloading. As a temporary measure, he used a bucket to prevent the leaking material from spilling on the ground. On June 17, Heinis decided to get the leak fixed and called Avery's principal, Kevin Avery, about having Avery's shop fix the leak. After Avery agreed,

---

[2]  The use of a tractor without a trailer is often referred to in the trucking industry as "bobtailing." An insurance policy providing non-trucking coverage designed to cover equipment when it is being used other than in the business of the carrier to whom it is leased is often referred to as "bobtail insurance," even though its coverage is not limited to when a tractor is being operated without a trailer. See, e.g., Hartford Ins. Co. of Southeast v. Occidental Fire & Cas. Co. of North Carolina, 908 F.2d 235, 236-37 & nn.2-3 (7th Cir. 1990); Jurey v. Kemp, 77 So.3d 83, 84-85 & n.1 (La. Ct. App. 2011).

[3]  Williston is the nearest commercial hub to Powers Lake where Avery's shop was located. Powers Lake is a small town located approximately 53 miles northeast of Williston, North Dakota, with the driving distance being closer to 75 miles. During the time Heinis leased his equipment to Avery, he continued to reside in South Dakota and only occasionally would return home.

Heinis pulled the tanker-trailer from Williston to Avery's shop at Powers Lake the same day. (Doc. Nos. 20-1, pp. 21-22; 20-2, p. 13).

There is no dispute over the fact that, when Heinis took his tanker-trailer to Avery's shop for repair, he was not under dispatch from Avery. Also, there is no dispute that the repair was Heinis's responsibility under the lease, that he was free to have the repair done elsewhere, and that the cost of having the leak repaired would ultimately be charged to his account. (Doc No. 20-1, pp. 7, 17, 22).

Avery's shop was not able to get to the repair immediately. After spending the evening, Heinis backed his tanker-trailer partway into Avery's shop on the morning of Sunday, June 18, and, an employee of Avery, Jesse Miller, undertook to make the repair. When Miller applied his lit torch to the location of the leak to begin welding, there was an immediate explosion in which Miller was injured.[4] It is undisputed that what exploded were residual petroleum fumes from the contaminated flowback water that Heinis had been hauling, presumably from his last load. (Doc. Nos. 20-1, p. 16; 20-2, pp. 14-15; 20-3, p. 6).[5]

---

[4] While not material to the court's present decision, the facts are somewhat murky in terms of where the leak was. Heinis testified in his deposition that the leak was in a pipe running between the pump on the trailer used for loading and unloading and the back of the trailer. (Doc. No. 20-1, pp. 20, 25). Miller in his deposition described the leak as being inside part of a valve. (Doc. No. 20-3, p. 9). For purposes of this case, the court will assume it was the former since that is the position taken by National.

[5] The reason why the source of the combustible fumes is not disputed is undoubtedly because of the following evidence: Miller and Heinis both stated in their depositions that the explosion took place when Miller first placed his torch to the trailer where it was leaking. According to Kevin Avery, who rushed out into the shop immediately afterwards, the explosion blew the manhole cover off the top of the tanker and the valve off the back (indicating the source of the combustible material was inside the tanker-trailer) and, when Heinis pulled the trailer out of the shop after the explosion, pit water with an oily residue leaked out onto the shop floor and left a trail all the way up the hill to a parking area where Heinis stopped to fully clean out the tanker. (Doc. No. 20-2, pp. 14-15). In addition, Miller testified that Heinis had told him prior to the accident that 9-10 gallons of water remained in the tanker, without specifying what type of water. (Doc. No. 20-3, p. 8). Heinis did not dispute Miller's account. He testified that, when he unloaded his last load of flowback water, he pumped it out the best he could using the pump on the trailer, but that some water would always remain using only the trailer's pump, and he did not attempt a more thorough cleaning. Heinis suggested this was a common practice among those who were hauling similar material. (Doc. No. 20-1, pp. 19-20).

The only factual dispute with respect to the accident, which potentially could be material for reasons discussed later, is whether Heinis had unhooked his trailer from the tractor before the repair was attempted. Heinis claimed he unhooked it because he was concerned the welding could damage the computer on the tractor and that he reconnected the tractor to the trailer following the accident to pull it out of the shop so the ambulance could get to Miller. (Doc. No. 20-1, p. 16). Kevin Avery, on the other hand, was adamant that the tractor was still hooked to the trailer when he ran into the shop following the explosion, recalling that all Heinis had to do to move the trailer was to get into the tractor and pull the trailer out of the shop. (Doc. No. 20-2, p. 15). Miller testified he too did not believe the trailer was unhooked, but could not be certain. (Doc. No. 20-3, pp. 6-7).

There is currently pending in state court a personal injury action brought by Miller against Heinis.

## II. APPLICABLE LAW

### A. Summary judgment standard

The standards for addressing motions for summary judgment are well known to the court and need not be repeated here. E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Barnhardt v. Open Harvest Co-op., 742 F.3d 365, 369 (8th Cir. 2014).

### B. Governing law

The court's jurisdiction in this case arises out of the diversity of citizenship of the parties. Consequently, the court looks to state law to resolve the substantive questions. E.g., George K. Baum & Co. v. Twin City Fire Ins. Co., 760 F.3d 795, 799 (8th Cir. 2014). The question of which state's law applies is resolved by applying the choice-of-law rules of the forum state. Id.; Platte Valley Bank v. Tetra Financial Group, LLC, 682 F.3d 1078, 1082-83 (8th Cir. 2012).

## III.    WHETHER NATIONAL'S POLICY AFFORDS COVERAGE

### A.    Introduction

The complete copy of National's policy contains a myriad of different coverages, endorsements, schedules, and other changes.  What has been submitted to the court is more than 1150 pages long and, even when copied double-sided, is 2½ inches thick.  In deciding whether the policy provides coverage to Heinis, the court must necessarily limit its consideration to those portions of the policy the parties have identified as being relevant.

Also, the court will apply North Dakota law in construing National's policy given that:  (1) National has not pointed to any policy provision purporting to dictate what law governs its interpretation; (2) the policy was issued to Avery as the "Named Insured" and Avery was headquartered and doing business  in North Dakota; and (3) the policy is replete with special North Dakota endorsements.  See Nodak Mut. Ins. Co. v. Wamsley, 2004 ND 174, ¶ 19, 687 N.W.2d 226.

The North Dakota Supreme Court has summarized the standards for construing insurance contracts under North Dakota law as follows:

> Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting.  We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction.  If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract.  While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage.  We will not strain the definition of an undefined term to provide coverage for the insured.  We construe insurance contracts as a whole to give meaning and effect to each clause, if possible.  The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

Farmers Union Mut. Ins. Co. v. Decker, 2005 ND 173, ¶ 4, 704 N.W.2d 857 (quoting Ziegelmann v. TMG Life Ins. Co., 2000 ND 55, ¶ 6, 607 N.W.2d 898).

**B.** **Section II(A) of National's "Motor Carrier Coverage Form" affords coverage**

    **1.** **The relevant policy language**

Great West contends that National owes Heinis coverage under that portion of its policy entitled "Motor Carrier Coverage Form." The language that Great West relies upon includes:

<div align="center">

**MOTOR CARRIER COVERAGE FORM**

</div>

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

*Throughout this policy the words "you" and "your" refer the Named Insured shown in the Declarations.* The words "we", "us" and "our" refer to the company providing this insurance.

\* \* \* \*

**SECTION II - LIABILITY COVERAGE**

**A.** **Coverage**

    *We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".*

    \* \* \* \*

    We will have the right and duty to defend any "insured" against a "suit" asking for such damages . . . . However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" . . . to which this insurance does not apply . . . . Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

    **1.** **Who Is An Insured**

        The following are "insureds":

        a.      You for any covered "auto".

        b.      Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

            (1)     The owner, or any "employee", agent or driver of the owner, or anyone else from whom you hire or borrow a covered "auto".

            (2)     Your "employee" or agent if the covered "auto" is owned by that "employee" or agent or a member of his or her household.

(3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

(4) Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), a lessee or borrower of a covered "auto" or any of their "employees", while moving property to or from a covered "auto".

(5) A partner (if you are a partnership), or member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

c. *The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected, is being used exclusively in your business.*

d. The lessor of a "covered auto" that is not a "trailer" or any "employee", agent or driver of the lessor while the "auto" is leased to you under a written agreement if the written agreement between the lessor and you does not require the lessor to hold you harmless and then only when the leased "auto" is used in your business as a "motor carrier" for hire.

e. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

However, none of the following is an "insured":

* * * *

* * * *

## SECTION VI - DEFINITIONS

* * * *

**B.** *"Auto" means:*

*1.* *A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or* * * * *

(Doc. No. 29-5, pp. 96-98, 107) (italics added). In addition, the only "Named Insured" in the declarations for purposes of applying the words "you" or "your" is Avery. (Doc. No. 29-5, p. 7).

**2.      Contentions of the parties re National's Motor Carrier Coverage Form**

Great West argues that Heinis is entitled to coverage for the accident in question under the italicized language of National's Motor Carrier Coverage Form set forth above.  In particular, Great West contends Heinis is an insured within the meaning of Section II(A)(1)(c) because the leased tractor was connected to the trailer at the time of the accident, but, even if not, the trailer was used exclusively in Avery's business.  National's response is threefold.  First, it argues that, even if the language relied upon by Great West nominally affords coverage, there are exclusions that take away that coverage, which are discussed separately below.  Second, National contends that whether the trailer was connected to the tractor at the time of the accident is a disputed question of fact.  Third, National argues that the trailer was not being used in Avery's business at the time of the accident, much less "exclusively" so.

The court will begin with the last of National's arguments.  Before doing so, however, it is helpful first to discuss the fact that the same question of whether the trailer was being used in Avery's business at the time of the accident also arises in deciding whether Great West's policy affords coverage.

As noted above, Section II(A)(1)(c) of National's Motor Carrier Coverage Form provides coverage if the covered auto, which is a trailer, "is being used exclusively in your [*i.e.*, Avery's] business."  And, as discussed in more detail later, Great West's policy does *not* extend coverage to an auto, which includes a trailer, that is "used in the business of anyone to whom the 'auto' is rented, leased or loaned."  Putting aside the use of the modifier "exclusively" in National's policy, there appears to be no material difference between the "being used . . . in your business" language of National's policy and the "in the business of" language of Great West's policy in terms of the

meaning of the word "business," as well as more generally, the intended application of the policy language. National's policy refers to Avery's business as a motor carrier, and Great West's policy refers to the business of anyone to whom the equipment is leased, which, in this case, would also be Avery. Hence, the operative question for both policies is whether the trailer involved in the explosion was being used in Avery's business at the time of the accident and, more particularly, "exclusively" so for National's policy.

In addressing the question of whether the trailer was being used in Avery's business at the time of the accident, the discussion that follows will sometimes use "in the business of" as a shorthand reference to the operative language from both policies when discussing cases applying similar policy language.

> **3.** **Whether the trailer was being used exclusively in Avery's business at the time of the accident**

> **a.** **The clear and unambiguous meaning of "in the business of"**

While there are a number of accepted usages of "business" (including, for example, a verbal abuse or scolding, *i.e.*, giving someone the "business"), the common and ordinary usage in this context is that a "business" is a commercial enterprise or activity. E.g., McGriff By and Through Norwest Capital Management & Trust Co. v. United States Fire Ins. Co., 436 N.W.2d 859, 862 (S.D. 1989) ("McGriff") ("Whether we go to Webster or to Black's Law Dictionary, both of which present various definitions [of 'business'], it is clear that they generally refer to a commercial enterprise or activity."); see generally Oxford English Dictionary (Online 3d ed. entry updated March 2012); Black's Law Dictionary 211 (8th ed. 2004).

A few courts have concluded "in the business of," or comparable policy language, is ambiguous because courts have reached different conclusions about how it should be applied in the

trucking context. <u>E.g.</u>, <u>Engle v. Zurich American Ins. Group</u>, 549 N.W.2d 589, 591 (Mich. Ct. App. 1996); <u>McLean Trucking Co. v. Occidental Fire & Casualty Co. of North Carolina</u>, 324 S.E.2d 633, 636 (N.C. Ct. App. 1985); <u>cf.</u> <u>Great West Cas. Co. v. Carolina Cas. Ins. Co.</u>, Nos. A05-1619, A05-1773, A05-1804, 2006 WL 1704125, at *7 (Minn. Ct. App. June 20, 2006) (unpublished opinion) (concluding there may be a latent ambiguity after the disputed facts are resolved because the phrase as applied could refer to when a load is being hauled for the lessee or more generally to any activities that benefit the lessee).

An often-cited case taking the opposite view in light of the generally understood meaning of "business" is <u>Hartford Ins. Co. of Southeast v. Occidental Fire & Cas. Co. of North Carolina</u>, 908 F.2d 235, 239 (7th Cir. 1990) ("<u>Hartford</u>") where the Seventh Circuit stated:

> The fact that contractual language may, on occasion, pose difficult factual applications does not make that language ambiguous.  [citation omitted].  The phrase "in the business of an . . . organization to whom the automobile is rented" clearly refers to occasions when the truck is being used to further the commercial interests of the lessee.

<u>Id.</u> at 239.  The weight of authority appears to be with the Seventh Circuit both in terms of the meaning ascribed to "in the business of," or comparable language, as well as the conclusion, explicitly or implicitly, that the language is not ambiguous.  <u>See</u>, <u>e.g.</u>, <u>Empire Fire and Marine Ins. Co. v. Brantley Trucking, Inc.</u>, 220 F.3d 679, 681-82 (5th Cir. 2000) ("<u>Empire Fire</u>") (quoting <u>Hartford</u>); <u>National Continental Ins. Co. v. Empire Fire & Marine Ins. Co.</u>, 157 F.3d 610, 612 (8th Cir. 1998) ("<u>National Continental</u>") (relying upon the Seventh Circuit's definition in <u>Hartford</u>); <u>Forkwar v. Empire Fire & Marine Ins. Co.</u>, No. WGC-09-1543, 2010 WL 3733930, at *14 (D. Md. Sept. 20, 2010) (applying Maryland law); <u>Wenkosky v. Protective Ins. Co.</u>, 698 F. Supp. 1227, 1230-31 (M.D. Pa. 1988) (concluding that comparable language in an exclusion was clearly worded and unambiguous and citing cases from other jurisdictions); <u>Casey v. Smith</u>, 846 N.W.2d 791, 797

(Wis. 2014) (adopting the interpretation set forth in <u>Hartford</u>, stating "it presents a clear rule that is consistent with the plain language of the exclusion" and citing other cases).

While there are no North Dakota cases directly on point, the North Dakota Supreme Court has stated it will give undefined terms their plain meaning and will not strain to find an ambiguity simply to find coverage. <u>E.g.</u>, <u>Farmers Union Mut. Ins. Co. v. Decker</u>, 2005 ND 173 at ¶ 4. And, in at least one auto insurance case, the court has concluded that "commercial" (a synonym for "business") and the similarly broad term of "occupation" were not ambiguous and should be accorded their commonly understood meanings. <u>See</u> <u>Bauerle v. State Farm Mutual Automobile Ins. Co. of Bloomington, Ill.</u>, 153 N.W.2d 92 (N.D. 1967). In addition, the North Dakota Supreme Court has essentially accorded the same meaning to the term "business" in other contexts. <u>Grand Forks Herald, Inc. v. Lyons</u>, 101 N.W.2d 543, 547 (N.D. 1960) (relying upon a Webster's dictionary definition for the term in construing a statute); <u>Green v. Frazier</u>, 176 N.W. 11, 17 (N.D. 1920) (the term "private business" is readily defined as a "business or enterprise" conducted for the purpose of private gain, enjoyment, or profit).

This court predicts that, if the North Dakota Supreme Court is called upon to decide the meaning of "in the business of," or similar language, in commercial trucking policies, it will likely follow the decisions of the Fifth, Seventh, and Eighth Circuits in <u>Empire Fire</u>, <u>Hartford</u>, and <u>National Continental</u>, respectively, and conclude the language means occasions when the equipment is being used to further the commercial interests of the lessee, given not only how the court has previously construed the term "business," but also because these are the more persuasive decisions.

### b. National's arguments for why the trailer was not being used "in the business of Avery" at the time of the accident

In this case, Avery did more than simply contact Heinis every time it wanted a load hauled and engage him to do so. Rather, for whatever reasons, Avery leased his tractor and trailer for use in its business for an indefinite term and, when the accident giving rise to the subject suit occurred, the tractor and trailer remained under lease to Avery. In view of this, the court will address, in turn, National's arguments for why the trailer was not being used in Avery's business within the meaning of National's policy at the time of the accident despite it being under lease.

### i. National's argument that the trailer was not under dispatch

National's primary argument for why the trailer was not being used in Avery's business at the time of the accident is because it was not then under dispatch - a fact which is not disputed. National cites cases that it claims overwhelmingly establish that whether or not the lessor-trucker is under dispatch is the decisive factor in terms of whether the equipment is being used "in the business of" the lessee-carrier. Upon examining these cases, however, it is clear that most do not stand for the broad proposition that National asserts. In some of the cases, there were other facts that were controlling (*e.g.*, the lessor-operator was using the equipment for personal travel or hauling loads for others) or the lease agreements were different than the one at issue in this case. Also, most of the cases did not address the specific situation presented here, where the equipment was being repaired at the time of the accident, the repairs were required by the lease, and the repairs clearly advanced the commercial interests of the lessee-carrier.[6]

---

[6] One of the few cases that comes the closest to supporting National's arguments is <u>Neal v. St. Paul Fire & Marine Ins. Co.</u>, 250 N.W. 2d 648 (Neb. 1977). However, the reported facts in that case are sparse and there is some suggestion the lessor-operator in that case was routinely hauling commodities for more than one carrier. In any event, as the Wisconsin Supreme Court recently pointed out in <u>Casey v. Smith</u>, <u>Neal</u> is premised upon a narrower reading of

In this case, it is clear from the record that Avery's business of providing trucking service to the oil and gas industry required not only the actual hauling of loads but also the ability to haul loads on a timely basis. This, in turn, required having the necessary operators and equipment available - both in the sense of being reasonably close (that is, the drivers not using the equipment to haul loads for other companies to distant points) and the equipment being in shape to haul the loads in a manner that would comply with any requirements of the lease agreements as well as those imposed by law. Artificially limiting what is the business of Avery to only when the equipment was actually under dispatch ignores not only the fact the equipment remained under lease to it and subject to its call while not under dispatch, but more broadly the economic reality of Avery's business being dependent upon having operators and equipment readily available.

While there is no North Dakota case on point, the court concludes the North Dakota Supreme Court would not apply "in the business of" or similar policy language to only when the leased equipment was under dispatch. Rather, the North Dakota Supreme Court would conclude the trailer was being used in the lessee-carrier's business so long as it was under lease, except, perhaps, if it was clearly being used for a purpose other than the lessee-carrier's business (*e.g.*, hauling loads for

---

the term "business" than that afforded by the Seventh Circuit in <u>Hartford</u>, which the Wisconsin Supreme Court concluded was more compelling. The court stated:

 [I]n <u>Neal v. St. Paul Fire & Marine Ins. Co.</u>, 197 Neb. 718, 250 N.W.2d 648 (1977), the Nebraska Supreme Court determined that bobtail coverage did not apply when the owner was getting maintenance work done on the truck pursuant to its contractual duties. It explained:

> While the carrier derived some benefit from the fact that the plaintiff attended to the maintenance of the tractor between trips, since that was essential to the continued use of the tractor in hauling commodities, the servicing and maintenance of the tractor was the responsibility of the plaintiff. The maintenance of the tractor was the "business" of the plaintiff, not that of the carrier.

<u>Id.</u> at 650. We find this reasoning unpersuasive as it is based on a narrower construction of the term "in the business of" than the one we adopt from <u>Hartford</u>.

<u>Casey v. Smith</u>, 846 N.W.2d at 798 n.5.

another carrier or for an obviously personal purpose of the lessor), which National has failed to demonstrate occurred here.[7]

But, even if there is some doubt about this as a general matter, the North Dakota Supreme Court would conclude that the trailer was being used in Avery's business at the time of the accident in this case in view of the particular facts and circumstances, including:

- The fact the trailer was under lease to Avery at the time of the accident.

- The obligation imposed upon Heinis of keeping the equipment in "good working condition" while it was leased to Avery (and being subject to default if he did not) coupled with the fact the repair in question was necessary to keep the trailer in good working condition, despite National's argument to the contrary, as discussed in more detail below.

- The fact that, aside from the particular obligation of the lease of keeping the equipment in good working condition, the repair furthered the commercial interests of Avery in that it insured the equipment could be operated in a manner so as not to expose Avery and its customers to potential liability for the consequences of the trailer leaking - particularly if the leak got worse.

- The lease requirement that Heinis remain in "constant contact" with Avery's dispatcher and respond to dispatched loads within a reasonable period of time, which is more demanding than that set forth in most, if not all, of the leases in the cases National claims are inapposite.

[7] In fact, National's policy taken as a whole suggests the same thing since, with respect to Heinis, there was coverage at all times the trailer was connected to his leased tractor, regardless of how the equipment was being used, and it was only when the trailer had been disconnected from the tractor that the qualification of it being used in exclusively in Avery's business applied.

- The fact that Heinis's tractor, which was used exclusively to pull the trailer, bore Avery's name throughout the term of the lease, including at the time of the accident.

- The fact that Heinis never used the trailer for another business purpose, such as hauling loads for himself or for other carriers - which is not surprising given the lease requirements as outlined earlier and the lack of any specific provision authorizing him to use the equipment under lease to Avery for anything other than Avery's business.

- The fact that Avery made its shop facilities and personnel available to repair the trailer, albeit at Heinis's expense.

See, e.g., Empire Fire, 220 F.3d at 682 (driver while en route to pick up a load after having the tractor serviced was "in the business of" the lessee-carrier, citing other repair and maintenance cases); National Continental, 157 F.3d at 612-13 (driver en route to have a front end alignment on a leased tractor between dispatches was "in the business of" the lessee-carrier because he was fulfilling contractual duties to keep the leased equipment in compliance with all laws and regulations); Hartford, 908 F.2d at 239-240 (driver while en route with the leased tractor to pick up a refrigeration trailer being repaired for a freon leak was "in the business of" the lessee because the repair furthered the lessee's commercial interests, noting the lease requirements to keep the equipment ready for lessee's services and to "exercise diligent efforts to assure continuing customer satisfaction"); Freed v. Travelers, 300 F.2d 395, 396-98 (7th Cir. 1962) ("Freed") (repairs to back end of trailer were "exclusively" within the business of the lessee-carrier, given the obligation under the lease requiring the lessor to keep the equipment "in good running order and condition," even though the lessor was responsible for the cost of the repairs and the repairs took place after the lessor

had completed hauling his last load); cf. Occidental Fire & Cas. Co. of North Carolina v. Soczynski, Civil No. 11-2412, 2013 WL 101877, at **12-15 (D. Minn. Jan. 8, 2013) (acknowledging that repairs may be in the commercial interests of the lessee-carrier but concluding that they were not in that case); Casey v. Smith, 846 N.W.2d 791 (Wis. 2014) (same).[8]

The only thing that gives the court pause is the North Dakota Supreme Court's decision in Zimprich v. Broekel, 519 N.W.2d 588 (N.D. 1994). In that case, the court was not called upon to decide the meaning of the language "in the business of" a lessee-carrier within the meaning of a commercial trucking policy. Rather, the issue in Zimprich was whether, under state law, the lessor-operator was acting as an employee of the lessee-carrier at the time he was attempting to make repairs to the air-conditioning unit of the leased tractor that caused a fire resulting in suit against the lessee-carrier for damage to the surrounding property. The parties in the case who argued the lessor-operator was an employee relied in part upon a federal motor carrier regulation that made an independent contractor who "operated" a licensed motor vehicle for a lessee-carrier a "statutory employee" of the lessee-carrier. In deciding whether or not the lessor-operator was "operating" the equipment at the time of the repair as an "employee," the North Dakota Supreme Court stated:

> However, the "statutory employee" doctrine does not render the employer/carrier strictly liable for all torts committed by its drivers. White v. Excalibur Insurance Co., supra, 599 F.2d at 53; C.C. v. Roadrunner Trucking, Inc., 823 F.Supp. 913, 919 (D.Utah 1993). Rather, the federal scheme merely creates a fictional employment relationship, and liability is then determined under applicable state law, including respondeat superior. See White v. Excalibur Insurance Co., supra, 599 F.2d at 53; C.C. v. Roadrunner Trucking, Inc., supra,

---

[8]  In Occidental Fire & Cas. Co. of North Carolina v. Soczynski, the federal district court in Minnesota concluded that a trip to add outriggers to a trailer was not in furtherance of the lessee-carrier's commercial interests because they were not required for hauling any of its loads. In reaching that conclusion, however, the court discussed with apparent approval those cases where repairs were held to be within the business of the lessee-carrier when required by the lease or when they otherwise furthered its commercial interests. 2013 WL 101877, at **12-15. More recently, in Casey v. Smith, the Wisconsin Supreme Court acknowledged that there may be a number of situations where repairs would be deemed to be "in the business of" the lessee-carrier, but concluded under the facts of that case (including different lease requirements from the ones here) that a repair to the grille of the tractor was not one of them. 846 N.W.2d at 797-800.

823 F.Supp. at 919-920; Paul v. Bogle, supra, 484 N.W.2d at 733. Liability in the present case thus turns upon respondeat superior, and, specifically, whether Broekel was acting within the scope of his "employment" when he performed repairs on the tractor in the warehouse.

Much of the confusion in this case stems from the fact that Broekel, in effect, wore two hats in his relationship with Hi-Tech. Although under federal law and the parties agreement, Broekel was an "employee" when operating the tractor for Hi-Tech's benefit, he also had separate responsibilities as the lessor/owner of the tractor. Several provisions in the parties' agreement unambiguously specify that Broekel was solely responsible for maintenance and repair of the tractor:

"5. Responsibility for Charges. The Contractor shall furnish and pay all costs of operation, including, but not limited to, the following:

* * * * *

"B. All maintenance costs and repairs.

* * * * * *

"10. Insurance.

* * * * * *

"B. Contractor agrees to carry bobtail and deadhead insurance coverage with respect to public liability and property damage . . . as concerns all equipment hereunder, when used in any way by the Contractor or his employees for any personal use or private or unauthorized transportation such as but not limited to . . . traveling to and from maintenance and repair sites . . . .

* * * * * *

"17. Contract-Owner. Contractor represents that he is the lawful owner or has lawful possession of the equipment described in this Agreement, which shall at all times during the term for this Lease, be maintained by the Contractor in good operating condition . . . ."

Broekel's deposition testimony also established that Hi-Tech exercised no control over the maintenance and repair of the tractor. Broekel testified that he was not reimbursed for maintenance time or expense; he deducted maintenance and repair costs on his tax returns; time spent repairing the tractor was recorded as off-duty time in his log book; Hi-Tech did not control where or by whom repairs were performed; and Broekel, in fact, performed much of the maintenance and repair work himself. Hi-Tech's lack of control is further demonstrated by Broekel's decision to proceed to Bismarck when repairs could not be made quickly in Fargo, and then to perform the work himself in warehouse space he leased personally for that purpose.

* * * *

We also note that the property owners have not argued that the repairs performed here were in the nature of emergency roadside repairs, immediately necessary to keep the vehicle operational. Broekel was able to continue from Fargo to Bismarck without the repairs. Once in Bismarck, he unhitched Hi-Tech's trailer and parked the tractor in his leased warehouse space. He then went about personal business, returning late the next day to work on the vehicle. Under these circumstances, Broekel clearly was performing his independent contractual duty to repair the vehicle, and was not at that time an employee "operating" the tractor on Hi-Tech's business.

519 N.W.2d at 591-92.

While there are things in the court's discussion that both sides here could claim as supporting their arguments, *e.g.*, the court's characterization of Broekel being off-duty and the repair being Broekel's obligation (potentially favoring National's arguments) or the court's caveat that the repair was not required to keep the equipment operational in the sense of being able to carry loads for Hi-Tech (potentially favoring Great West's argument), the court's discussion is too focused on the question of whether Broekel was "operating" his equipment as an "employee" (which, in turn, focused on whether or not he was subject to the lessee-carrier's direction) when he attempted the repairs to be of significant help to either side with respect to whether, in this case, the trailer was being used "in the business of" Avery at the time of the accident in the sense of whether it advanced Avery's commercial interests.[9]  Zimprich, however, is relevant to another issue presented in this case and will be returned to later.

ii.      **National's arguments for why the repair was not in Avery's business**

National argues the repair was not in Avery's business because it was not needed to keep the equipment operating for Avery's purposes.  National points to the lack of evidence that the tanker leaked when it was being hauled down the road, *i.e.*, it leaked only during loading and unloading, and that Heinis was able to capture the leaked material in a bucket.  National then proceeds to take issue with Great West's contention that the repair was required to avoid Avery, as the federally-certificated carrier, being exposed to a violation of 49 C.F.R. 393.100(b), which is a federal motor carrier regulation requiring that cargos be secured to prevent, among other things, spilling or

---

[9]  Obviously, an entity's business can extend to activities beyond those carried out by its employees.  In fact, in this case, Avery conducted much of its business using independent contractors.  What also distinguishes Zimprich from this case in terms of the facts, perhaps, is the arguable lack of necessity of the repair for the lessee-carrier's business, *i.e.*, the repair of the air conditioning unit being more for the personal comfort of the lessor-operator, and the differing lease provisions.

leaking. National contends the regulation only applies when the cargo is being transported on public roads and that the evidence here is that the trailer only leaked when it was being loaded or unloaded on what National presumes to be private property.

National is probably correct about the inapplicability of 49 C.F.R. 393.100(b) to the facts of this case. The problem with its argument more generally, however, is that Avery's business extended to the loading and unloading of the material to be hauled - not just its physical transportation, and repairs that would insure that the loading and unloading were done properly would obviously be in its commercial interest notwithstanding Heinis's use of the band-aid of the bucket to capture the leaking material.[10] Moreover, National ignores the fact that Heinis was obligated under the lease to do more than meet minimum federal regulatory requirements with respect to the condition of the equipment. The lease specifically required he keep the equipment "in good working condition," and it is common sense that a leaking trailer would be a breach of that obligation.[11]

---

[10] If Heinis failed to capture the leaking "flowback" water in his bucket or the leak got worse and overwhelmed his ability to do so, Avery, as well as potentially its customers who owned or controlled the property where a spillage occurred and were responsible for operations conducted on their property, could face civil and even criminal liability under North Dakota's nuisance law as well as laws governing the disposal of oil field wastes. See, e.g., N.D.C.C. ch. 42-01 (North Dakota's nuisance law which provides for both civil and criminal enforcement); N.D.C.C. §§ 38-08-16 - 38-08-17 (providing for civil and criminal enforcement of North Dakota Industrial Commission rules pertaining to the improper disposal of oil field waste material); N.D. Admin. C. § 43-02-03-19.2 (an Industrial Commission regulation requiring proper disposal of oilfield wastes including disposal of pit water only in an authorized disposal well or in another approved manner). Further, without turning this opinion into a primer on environmental law, there would also be potential liability if the spilled material reached nearby surface or groundwater. See N.D.C.C. § 61-28-06. In addition, even if the trailer leaked only while loading and unloading, it may have presented a safety hazard, if there was a nearby source of ignition, and subjected Avery to potential liability if an accident occurred.

Obviously, a repair that protects Avery and its customers from being exposed to civil and criminal liability would further Avery's commercial interests. Not surprisingly, Kevin Avery made clear in his deposition testimony that he would not have permitted the trailer to be used in Avery's operations if it was leaking, regardless of whether on the roadway or off, because it would be both an environmental and safety hazard. (Doc. No. 20-2, pp. 22-23).

[11] Any argument by National to the contrary would fail for lack of evidence that a proper design for the pipe was that it could leak some or that the trailer came standard with a bucket.

National also contends that the fact Heinis was obligated under the lease to pay for the repairs made it his business and not Avery's. The same can be said, however, for other things, including the fuel that Heinis was obligated to pay for. And, following this logic, there would be no coverage under National's policy if while hauling a load for Avery, Heinis pulled his rig into a truck stop for fuel and was involved in an accident. In short, the North Dakota Supreme Court would likely conclude, as other courts have, that the fact Heinis was financially obligated to pay for the repairs is insufficient to negate the fact the trailer was leased to Avery and the other factors previously discussed. See, e.g., Freed, 300 F.2d at 398 (repair was in furtherance of the lessee-carrier's business notwithstanding the lessor-operator being responsible for the cost of the repair); National Continental, 157 F.3d at 612-13 (same).[12]

### iii.     National's argument that the repair was not "exclusively" in Avery's business

National argues that, even if the repair was within Avery's business, it was not "exclusively" so. However, there is no evidence that Heinis was using the trailer to haul loads for others while it was under lease to Avery. Further, there is nothing to indicate he had the right (much less the practical ability) to do so, given the facts already mentioned, i.e., the equipment was under lease to Avery with Avery's name affixed to the tractor, the lease did not specifically authorize Heinis to use

---

[12]   One of the few cases that comes the closest to supporting National's arguments is Neal v. St. Paul Fire & Marine Ins. Co., 250 N.W. 2d 648 (Neb. 1977), where the Nebraska Supreme Court held that ordinary maintenance work done in between dispatched trips was not in the business of the lessee-carrier. The court stated:

> While the carrier derived some benefit from the fact that the plaintiff attended to the maintenance of the tractor between trips, since that was essential to the continued use of the tractor in hauling commodities, the servicing and maintenance of the tractor was the responsibility of the plaintiff. The maintenance of the tractor was the "business" of the plaintiff, not that of the carrier.

Id. at 650. However, the facts of that case are sparse and there is some suggestion that the lessor-operator in that case was routinely hauling commodities for more than one carrier. In any event, Neal is premised upon a narrower application of the "in the business of" language than that afforded by the Seventh Circuit in Hartford and the Eighth Circuit in National Continental. See Casey v. Smith, 846 N.W.2d at 798.

the trailer for the business purposes of others while under lease to Avery, and the lease requirements that Heinis remain in "constant contact" with Avery's dispatcher and respond to dispatches within a reasonable period of time. See Freed, 300 F.2d at 398 (repairs to back end of truck were "exclusively" within the business of the lessee-carrier for equipment used only for the lessee-carrier's business).

National also contends that the repair was not exclusively in Avery's business because it also benefitted Heinis in the sense it allowed him to continue leasing the equipment to Avery - an argument which, by the way, acknowledges the commonsense notion that a lessee would consider unacceptable a leaking piece of equipment. The North Dakota Supreme Court would also reject this argument. As already noted, the relevant language making a lessor of a trailer in certain circumstances an insured here reads:

> anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected, is being used exclusively in your business.

(Doc. No. 29-5, p. 98). To include the leasing business of the person from whom the trailer is hired or borrowed as part of the determination of whether it is being used exclusively in the named insured's business would render the coverage a nullity since there would never be a situation where a leased trailer would be used exclusively in the named insured's business. Rather, the policy's use of the word "exclusively" was obviously intended to make clear there would be no coverage when the trailer, even though under lease to the named insured, was being used for purposes inconsistent with the named insured's business, *e.g.*, hauling loads for third parties or the lessor-operator using it for a clearly personal purpose.

**National's argument based on the deposition testimony of Heinis and Kevin Avery**

Finally, National points to the fact that both Heinis and Kevin Avery testified in their depositions that Heinis was not acting in Avery's business at the time of the accident. To the extent this opinion testimony of a layperson is relevant - much less entitled any weight (which the court doubts), it is insufficient to trump the clear meaning of "in the business of" in the policies in question, the lease requirements, and the actual conduct of the parties, either in creating a fact issue warranting a trial or altering the court's conclusions about the application of the policy language to the facts. Cf. Northland Ins. Co. v. Rhodes, No. 09-cv-01691, 2010 WL 5110107, at *10 (D. Colo. Dec. 9, 2010) (rejecting layperson opinion testimony that the truckers in the case were not employees because they had not focused upon the correct factors and, in any event, because "neither . . . were competent to opine as they did").[13]

---

[13]     In terms of the meaning of the language "in the business of" as used in the two insurance policies, the opinions are irrelevant for several reasons. First, neither Heinis nor Kevin Avery were asked about the meaning of the term as used in the policy. Second, any opinion they may have expressed on that subject would be irrelevant because of the court's conclusion that the language in question is not ambiguous, *i.e.*, extrinsic evidence is not required to ascertain its meaning. Third, even if the policy language was ambiguous, there is no evidence these opinions were conveyed to National as part of a negotiation prior to the issuance of the policy (or to Great West for its policy), and after-the-fact opinions of contract language not contemporaneously expressed are generally not relevant under North Dakota law for purposes of resolving an ambiguity. See National Bank of Harvey v. International Harvester Co., 421 N.W.2d 799, 804 (N.D. 1988) ("It is the outward manifestations of assent which govern, not the secret intentions of the parties."). Also, the testimony is irrelevant to construing the lease since the language in question is not a lease term and no contention has been made the lease is ambiguous. Hence, the only potential relevance would be with respect to the application of the lease requirements to the particular facts and the bearing this has on the ultimate question of whether the trailer was being used in Avery's business within the meaning of the National's policy. And, as to that, there is no guarantee Heinis and Avery considered all of the relevant factors, and, conversely, did not rely upon irrelevant ones, when they expressed their opinions. In fact, it appears their notions of Avery's business were too narrowly focused on the fact Heinis earned revenue only when he was using the equipment to haul loads for Avery, which, in this case, was merely the mechanism chosen for providing compensation for the leased equipment and is of secondary import to the other factors discussed earlier. Unlike some trucking arrangements where lessor-operators routinely haul for multiple carriers and essentially "trip lease" the equipment (*e.g.*, hauling a load for one carrier and on return picking up and hauling a load for another), Avery leased the equipment for an indefinite term and tied up the equipment for its exclusive use by virtue of the lease provisions previously discussed.

### 4. Conclusions re coverage under National's Motor Carrier Coverage Form

In summary, the court concludes that the trailer was being used exclusively in Avery's business at the time of the accident, with the result being that Section II of National's Motor Carrier Coverage Form affords coverage to Heinis for any liability he may owe Miller absent an applicable exclusion. And, since the court has reached this conclusion, a trial is not necessary to resolve the disputed question of whether the tractor was connected to the trailer at the time of the accident. For if it was, it appears this would also afford coverage under National's policy - a point that National appears not to dispute if neither of the policy exclusions it relies upon foreclose coverage. However, before addressing the exclusions, the court will first address Great West's alternative argument that National's policy also affords Heinis coverage under a "Hired Autos Specified as Covered Autos You Own" endorsement.

### C. "Hired Autos Specified as Covered Autos You Own" Endorsement

#### 1. Introduction

National's policy contains an endorsement entitled "Hired Autos Specified as Covered Autos You Own," which, among other things, modifies the coverage under the Motor Carrier Coverage Form. The endorsement reads in pertinent part as follows:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**HIRED AUTOS SPECIFIED AS**
**COVERED AUTOS YOU OWN**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| |
|---|
| **Named Insured:** |
| **Endorsement Effective Date:** |

SCHEDULE

| |
|---|
| **Description of Auto:** |
| ND - 126  1977 Trail                              VIN# S41021 |
| |
| |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations |

**A.**     Any "auto" described in the Schedule will be considered a covered "auto" you own and not a covered "auto" you hire, borrow or lease.

**B.**     **Changes in Liability Coverage**

For an "auto" designated or described in the Schedule, **Who is An Insured** is changed to include as an "insured" the owner or lessor named in the Schedule.  However, the owner or lessor is an "insured" only for "bodily injury" or "property damage" resulting from the acts or omissions by:

**1.**     You;
**2.**     Any of your "employees" or agents; or
**3.**     Any person, except the owner or lessor or any "employee" or agent of the owner or lessor, operating an "auto" with the permission of any of **B.1** and/or **B.2** above.

(Doc. No. 29-6, p. 167).  In this case, it is undisputed that the "auto" identified in the "Schedule" of the endorsement is the trailer involved in the accident.

> **2.     The likelihood that Heinis also has coverage under the "Hired Autos Specified as Covered Autos You Own" Endorsement**

Great West contends that paragraph B of the endorsement modifies the "Who is An Insured" portion of National's Motor Carrier Coverage Form at Section II(A)(1), such that it expands the

available coverage by "including" an owner or lessor named in the "schedule" as an "insured" for coverage for acts or omissions that would include those of Avery and its employees.[14]  Great West argues that the accident in this case arose, at least in part, as result of the acts of Miller, who was Avery's employee.

National does not dispute that the endorsement adds to those who are considered an insured under Section II(A)(1) of the Motor Carrier Form.[15]  Rather, it contends that the language of the endorsement does not apply for two reasons.  First, National contends that the language of paragraph B "Changes in Liability Coverage" does not apply because Miller cannot recover for any percentage of fault that may be assigned to him in his suit against Heinis under North Dakota's comparative fault law.  And, since Heinis can never be held liable to Miller for Miller's acts or omissions, the language relied upon by Great West does not apply, according to National.

The court disagrees.  Section II of the Motor Carrier Coverage Form extends coverage for damages that the insured is required to pay arising out of "bodily injury," and the "bodily injury" covered in the endorsement is that resulting from "acts or omissions" of  the Named Insured or its employees or agents.  There is no mention in the language of the endorsement that the acts or omissions must be "negligent" or "intentional."  In other words, fault is not an element.  All the language requires is a casual connection between an act or omission of the Named Insured or its employees or agents and the resulting injury for there to be coverage.  And here, since it is

---

[14]  As noted earlier, "you" or "your" under National's policy refers to the "Named Insured," which in this case is Avery.

[15]  Great West expressed concern in its briefing that National may have taken the position in its answer that the endorsement limited the situations in which Heinis would be an insured under the policy.  However, National made no such argument in its briefing here, either in response to Great West's motion for summary judgment or in support of its own motion.  Consequently, any such contention has now been waived.  See Robinson v. American Red Cross, 753 F.3d 749, 754 (8th Cir. 2014); Satcher v. University of Arkansas at Pine Bluff Bd. Of Trustees, 558 F.3d 731, 735 (8th Cir. 2009).  Further, it likely would be without merit in any event.

undisputed that the explosion took place when Miller put his put his welding torch to the trailer and ignited the residual petroleum-based fumes contained within it, a reasonable factfinder could only conclude that the accident was in substantial part the result of an act of Miller.

National also argues that the language in paragraph B of the endorsement does not apply because Heinis was not named in the schedule. While there is language in paragraph B which suggests that it only applies to owners or lessors "named in the Schedule," there is also language that references the auto designated or described in the "Schedule," and the box in the endorsement for setting forth the "Schedule" could be read as requiring only a description of the auto. In addition, Avery's policy includes a number of items of equipment of other lessors that have been added using the same form endorsement and in no case was the lessor identified by name. Finally, in the case of the trailer at issue here, as well as most of the other pieces of equipment for other lessors, the vehicle identification number ("VIN") was listed. Given the foregoing, the court suspects that, even if the endorsement nominally provides for the listing of the name of the owner or lessor of the auto, it was an overlooked requirement by the person who put the policy together for National (possibly due to the lack of clarity of the form) or that the VIN was used as a proxy for the name of the owner or lessor. At best, National has created a fact issue with respect to whether Heinis had to specifically be identified in the "Schedule" for paragraph B of the endorsement to apply, and Great West has created a fact issue with respect to whether any such requirement was waived.

In summary, if the court is wrong about there being coverage under the Motor Carrier Coverage Form of National's policy because the trailer was being used exclusively in Avery's business at the time of the accident, a trial would be required to consider the disputed facts relevant to whether the "Hired Autos Specified as Covered Autos You Own" endorsement provides coverage,

in addition to the disputed fact referenced earlier as to whether the trailer was connected to the tractor at the time of the accident, so as to afford coverage under the National Carrier Coverage Form irrespective of the endorsement.

**D.** **National's claim of exclusions from coverage**

**1.** **Relevant policy language**

National claims that the "employer's liability" and "fellow employee" exclusions set forth in Section II(B)(4-5) of its Motor Carrier Coverage Form apply and preclude any coverage to Heinis. The exclusions read as follows:

**B.** **Exclusions**

This insurance does not apply to any of the following:

* * * *

**4.** **Employee Indemnification And Employer's Liability**

"Bodily injury" to:

a. An "employee" of the "insured" arising out of and in the course of:

(1) Employment by the "insured"; or

(2) Performing the duties related to the conduct of the "insured's" business; or

b. The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph a. above.

This exclusion applies:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

* * * *

**5.** **Fellow Employee**

"Bodily injury" to:

<div style="margin-left: 2em;">

a.    Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

b.    The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph a. above.

</div>

(Doc. No. 29-5, pp. 99-100). Also relevant to the court's consideration of the two exclusions are the definitions of "employee," "insured," and "leased worker" under Section VI of the Motor Carrier Coverage Form, which read as follows:

**SECTION VI – DEFINITIONS**

* * * *

**F.**    "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.**    "Insured" means any person or organization qualifying as an insured in the Who is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

* * * *

**I.**    "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

(Doc. No. 29-5, p. 108).

## 2.    The "employer's liability" exclusion

National argues that the "employer's liability" exclusion set forth above (*i.e.*, Section II(B)(4) of the Motor Carrier Coverage Form) excludes coverage in this case because Avery is an "insured" and the injury happened to Miller, one of its employees. Great West disagrees, arguing that the operative language only applies to the insured against whom a claim of liability is being made and not all insureds. Great West contends this is particularly so when the second sentence in the definition of "insured" under Section VI(G) of the Motor Carrier Coverage Form is considered,

which is that coverage applies separately to each insured who is seeking coverage, which is commonly referred to in the industry as the "severability clause."

### a. The Eighth Circuit's 1966 decision in <u>Farmers Elevator Mutual</u>

National argues this court is bound by the Eighth Circuit's decision in <u>Farmers Elevator Mut. Ins. Co. v. Carl J. Austad & Sons, Inc.</u>, 366 F.2d 555 (8th Cir. 1966) ("<u>Farmers Elevator Mutual</u>"), which is a case that arose out of this district. In <u>Farmers Elevator Mutual</u>, the injured party was a driver employed by a trucking company that had leased its equipment to another trucking company with an ICC permit. The trucker was injured during the process of unloading propane from his truck into tanks at a local elevator. The trucker sued the elevator. In <u>Farmers Elevator Mutual</u>, which was an action for declaratory judgment, the elevator's insurer claimed that the insurance company for the trucking company employing the injured trucker was obligated to provide a defense and indemnity to the elevator by virtue of a provision of its policy that included as an insured a person using the truck with the permission of the named insured. The elevator's insurer claimed the elevator was using the truck during the process of unloading. <u>Id.</u> at 556-57.

This court held the elevator was not an insured under the trucking company's policy, concluding the elevator had not used the truck since the unloading was done exclusively by the injured trucker. This court also held that, even if the elevator was using the truck during unloading within the meaning of the policy, coverage was excluded by an employer's liability exclusion which the court concluded applied since the injured trucker was an employee of the trucking company (the named insured) even though it was the elevator (an additional insured) that was claiming coverage and the injured party was not one of its employees. <u>Id.</u> at 557-59.

On appeal, the Eighth Circuit upheld this court's decision that the policy language did not extend coverage to the elevator in the first instance. Id. at 558. However, the court did not stop there and proceeded to address this court's alternative holding with respect to the application of the employer's liability exclusion. The Eighth Circuit noted that "[w]hether this exclusion applies to suits against an omnibus insured by an employee of the named insured is a question that has produced a wide split of opinions among the courts." Id. at 559. The court went on to conclude that this court had not clearly erred in holding the exclusion applied given the lack of any North Dakota decision on point and the lack of any ambiguity in the policy. Id.

Great West argues that Farmers Elevator Mutual is not binding here because there is no mention in the decision of there being a severability clause, much less an argument that it would have changed the calculus with respect to application of the "employer's liability" exclusion in that case. Great West's argument is well taken. However, before discussing why, it is necessary first to consider the North Dakota Supreme Court's decision in Northwest G.F. Mut. Ins. Co. v. Norgard, 518 N.W.2d 179 (N.D. 1994) ("Norgard"), which came after the Eighth Circuit's decision in Farmers Elevator Mutual.

### b.     The North Dakota Supreme Court's 1994 decision in Norgard

Apparently, the only case where the North Dakota Supreme Court has addressed the interplay between a severability clause and a policy exclusion is its 1994 decision in Norgard. In that case, a husband and wife had purchased a homeowner's policy that included an endorsement for coverage for a day care being operated out of their home by the wife. The husband was later convicted of gross sexual imposition for having engaged in sexual contact with one of the children attending the day care. When the parents of the child sued, the insurance carrier providing the "day

care" coverage brought a declaratory action against the husband and wife contending the coverage was excluded under a sexual-molestation exclusion in the endorsement that read as follows:

> [T]he bodily injury and property damage coverage provided under this endorsement does not apply:
>
> a.   to bodily injury or property damage arising out of sexual molestation, corporal punishment or physical or mental abuse inflicted upon any person by or at the direction of an insured, an insured's employee or any other person involved in any capacity in the day care enterprise. . . .

The wife disagreed.  She argued (1) the language of the exclusion did not apply to her because, unlike her husband who was sued for his intentional conduct, she was sued only for negligence, and (2) she was entitled to be treated separately for coverage purposes because of the severability clause in the policy, which read as follows:

> Severability of Insurance. This insurance applies separately to each insured except with respect to the Limit of Liability. Therefore, this condition will not increase the Annual Aggregate Limit of Liability regardless of the number of insureds.

Norgard, 518 N.W. at 180-81.

In considering the wife's argument, the North Dakota Supreme Court observed that "the jurisdictions that have attempted to reconcile severability clauses and exclusionary clauses have not done so uniformly." Id. at 182.  The court discussed the divergent views taken in several cases by other courts and went on to conclude that the presence of the severability clause created an ambiguity with respect to whether the exclusion applied to the wife's claim of coverage.  Id. at 182-83.  The court stated:

> We have considered the varying views regarding the interplay of severability clauses and exclusionary clauses, and we find them instructive.  Relying on Worcester, many courts have found severability clauses to create ambiguities and have construed the policies against insurance companies; we believe Northwest rolls the dice by insisting that the policy is clear on its face and by not attempting in the policy itself to more carefully reconcile the severability clause and the exclusions.

<u>Id.</u> at 183.  The court then proceeded in a footnote to reject the insurer's argument that the uncertainty created by the presence of the severability clause was removed by the choice of articles used to describe the insured in the exclusion.  The insurance carrier had argued that the exclusion's reference to "*an* insured" unambiguously referred to both an insured claiming coverage and all other insureds as opposed to what would have been the case had the policy used the words "*the* insured," which the insurance carrier contended would have referred only to the insured seeking coverage.[16]

<u>Id.</u> at 183 n.2.

After concluding the presence of the severability clause created an ambiguity, the North Dakota Supreme Court proceeded to resolve the ambiguity by applying statutory rules of contract construction.  The court stated:

> However, the ambiguity here is resolved by applying the rules for interpreting contracts, contained in NDCC Chapter 9-07.  Determinative is the unique language of this exclusion; the exclusion does not pertain only to the acts of an insured, but also to the acts of "an insured's employee or any other person involved in any capacity in the day care enterprise...."
>
> Under sections 9-07-03 and 9-07-04, NDCC, we attempt to give effect to the mutual intention of the parties as expressed by the language of the contract.  The sexual molestation clause is clear on its face:  no coverage is provided where anyone connected with the operation of the day care commits an act of sexual molestation on one of the children.  The policy clearly and specifically reflects the parties' intention to place these risks outside the scope of coverage.
>
> Section 9-07-12 directs that a contract may be explained by reference to the circumstances under which it was made and the matter to which it relates.  The circumstances under which the policy was made is clear.  The increase in legal actions involving sexual abuse of children by adults who are not strangers to the children, *i.e.*, parents, relatives or caretakers, is dramatic. The policy clearly and specifically places these risks outside the scope of coverage.
>
> As between the two clauses, the sexual molestation exclusion is a particularly tailored provision that excludes any coverage for specific actions of specific individuals, whereas the severability clause is a more general provision concerned with who is covered.  The rules of contract interpretation are akin to the rules for interpreting statutes, *compare*

---

[16]    Interestingly, the words "*the* insured" that the insurance carrier in <u>Norgard</u> argued would have unambiguously referred only to the insured claiming coverage are the same words used in the "employer's liability" exclusion in this case, which National, by necessity, must contend unambiguously would refer to all insureds, including the named insured.

NDCC Chapter 1-02 *with* NDCC Chapter 9-07; we conclude that a provision such as the exclusion dealing specifically with sexual molestation of children prevails over the more general severability clause. Moreover, "[t]he purpose of severability clauses is to spread protection, to the limits of coverage, among all of the . . . insureds. The purpose is not to negate bargained-for exclusions which are plainly worded." National Ins., Etc. v. Lexington Flying Club, 603 S.W.2d 490, 492 (Ky.App.1980).

Similarly, section 9-07-17 provides that "[r]epugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clause subordinate to the general intent and purposes of the whole contract." To construe the severability clause to provide coverage in these circumstances is repugnant to the plainly-worded exclusion. The severability clause is subordinate to the sexual molestation exclusion.

We conclude that the application of these rules "clearly indicate that the parties, particularly the insured, contemplated no coverage," Walle Mut. Ins. Co. v. Sweeney, supra at 181 [VandeWalle, J., concurring specially], where the named insured himself, rather than a stranger to the day care, commits an act of sexual molestation. The contract may be a contract of adhesion, Continental Cas. Co., supra, but we will not find coverage where to do so would be perverse to a clearly stated exclusion. Ray is not a stranger to the day care; the day care was operated in the house in which Ray lived and was present day to day. Under the contract, Ray's acts of sexual molestation bar coverage for anyone, including Jean.

Id. at 183-84 (footnotes omitted).

> **c.** **The presence of the severability clause in this case creates an ambiguity which must be resolved against National as to the applicability of the "employer's liability" exclusion**

This court is not bound by the Eighth Circuit's decision in Farmers Elevator Mutual since it did not address the applicability of a severability clause, which is material here since its presence, when considered in relation to the "employer's liability" exclusion, creates an ambiguity as to whether only claims for injuries by employees of the insured seeking coverage are excluded or whether claims for injuries by employees of all insureds, including the named insured, are excluded. The court reaches this conclusion based on its own consideration of the policy language as well as its belief that the North Dakota Supreme Court would reach the same conclusion for two reasons. The first is the fact that the court in Norgard found the presence of the severability clause in that case created an ambiguity when considered with the sexual molestation exclusion.

The second is the fact that the sexual molestation exclusion in <u>Norgard</u>, which the North Dakota Supreme Court characterized as "unique," is substantially different in nature from the "employer's liability" exclusion at issue here. The sexual molestation exclusion excluded liability for specific types of acts and contained language that clearly suggested the exclusion would apply regardless of who committed them. <u>Norgard</u>, 518 N.W.2d at 183 ("Determinative is the unique language of this exclusion; the exclusion does not pertain only to the acts of an insured, but also to the acts of 'an insured's employee or any other person involved in any capacity in the day care enterprise . . . .'"). In contrast, the focus of the "employer's liability" exclusion in National's policy is upon acts or omissions caused by persons related to the insured, so that one very plausible reading of the policy language taken as a whole in view of the severability clause is that the "employer's liability" exclusion only excludes coverage for claims brought by an employee of the insured seeking coverage. In short, if the presence of the severability clause in <u>Norgard</u> created an ambiguity, it is even more true in this case.

Having concluded there is an ambiguity in National's policy between the insuring language of the policy (including the severability clause) and the "employer's liability" exclusion, the court must proceed to resolve the ambiguity. And here, National has not proffered any extrinsic evidence that would be material to the issue. Consequently, even if it was appropriate to resolve the ambiguity by conducting a trial - as opposed to simply imposing the tie-breaker of construing the language against the insurer, which the case law cited earlier governing the construction of insurance contracts seems to suggest is the required course of action, the court in this instance need only do the latter. Further, this is what the North Dakota Supreme Court would likely decide, particularly

given its statement in <u>Norgard</u> that the insurer there could have and should "more carefully reconcile[d] the severability clause and the exclusions." <u>Norgard</u>, 518 N.W.2d at 183.

Finally, even if the North Dakota Supreme Court would not find the policy language to be ambiguous and construe it in favor of the insured seeking coverage for that reason, the court is likely to conclude that the exclusion, given both its purpose and its wording, does not trump the severability clause. In other words, construing the policy as a whole, the exclusion would apply only when the bodily injury is to an employee of the insured claiming coverage, which appears to be the majority view. <u>See</u>, <u>e.g.</u>, <u>Penske Truck Leasing Co., Ltd. Partnership v. Republic Western Ins. Co.</u>, 407 F. Supp. 2d 741, 744-52 (E.D.N.C. 2006) (predicting this is what the North Carolina courts would hold and citing authority for it being the majority position).

### 3. The "fellow employee" exclusion

#### a. National's argument

National also argues that its policy exclusion for injuries to "fellow employees" applies and excludes coverage for Heinis. In advancing this argument, National makes no effort to claim Heinis was an employee of Avery (and thereby a fellow employee of Miller) under the state law. Rather, National relies upon the definition of "employee" set forth in the federal regulatory scheme governing interstate motor carriers, which makes an independent contractor who operates the equipment of a regulated carrier a "statutory employee" for some purposes.

Before turning to the specifics of this argument, it is helpful for purposes of context to first consider the scope of the federal motor carrier regulatory scheme and the fact it does not preempt state and common law liabilities, except to add to the liability of motor carriers in certain instances.

### b. Federal regulatory framework

The history of the rather complex federal regulatory scheme governing interstate motor carriers has been detailed in a number of cases and need not be recited in detail here. See, e.g., Carolina Cas. Ins. Co. v. Yeates, 584 F.3d 868, 873-76 (10th Cir. 2009) ("Yeates"); Prestige Casualty Co. v. Michigan Mutual Insurance Co., 99 F.3d 1340, 1342-43 (6th Cir. 1996); Carolina Cas. Ins. Co. v. Insurance Co. of North America, 595 F.2d 128, 134-37 (3d Cir. 1979); Luizzi v. Pro Transport, Inc., No. 02-cv-5388, 2013 WL 3968736, at **12-13 (E.D.N.Y. July 31, 2013); Crocker v. Morales-Santana, 2014 ND 182, ¶¶ 14-15, __ N.W.2d __; Roberson v. Industrial Com'n (P.I. & I. Motor Exp., Inc.), 866 N.E.2d 191, 200-02 (Ill. 2007) ("Roberson").  In a nutshell, however, the long-standing practice of motor carriers using leased equipment supplied by independent-contractor operators led to a number of abuses.  Many of the independent contractors operated on a shoestring.  This led to the operation of poorly maintained equipment which created safety hazards for the traveling public.  It also resulted in the inability of the independent-contractor operators to satisfy judgments for personal injuries and property damage when accidents did occur, with the more solvent motor carriers hiding behind the independent contractor status of their operators to avoid liability.  In addition, the more unscrupulous carriers relied upon the independent contractor status of their operators to avoid responsibility for compliance with safety regulations.  See id.

The current regulatory scheme is the end product of Congress's response over the years to address these abuses as well as other issues.  Relevant here is the fact that Congress's response included: (1) provisions that make an independent-contractor lessor-operator a "statutory employee" of the motor carrier in certain situations to ensure that the lessee-carriers are responsible for compliance with safety regulations as well as the lessor-operators; (2) provisions that have the effect

of making a motor carrier responsible and liable as a matter of federal law for the operation of the leased equipment vis-a-vis the traveling public when operated on public roadways; and (3) minimum requirements for financial responsibility to help ensure that any judgments obtained by the public for personal injury or property damage will be collectible. See id.

What is important to understand about the federal regulatory scheme for purposes of this case are three things. First, while it imposes *additional* liability upon motor carriers for the acts of its independent contractors in some instances, it does not purport to supplant, diminish, or otherwise provide safe harbor from existing tort liability of carriers and lessor-operators under state law. Second, the federal regulatory scheme does not preempt the state law distinctions between an independent contractor and an employee, except to the limited extent of making an independent-contractor operator a "statutory employee" of the lessee-carrier for purposes of enforcement of federal safety regulations and imposing *respondeat superior* liability for the acts of the independent contractor in certain instances. Third, there is nothing that purports to impose mandatory contract terms for private insurance contracts, except to the extent that, if a lessee carrier elects to obtain a federally-prescribed endorsement as one alternative for complying with federally-imposed minimum requirements for financial responsibility and the insurance company agrees to provide the endorsement, then the terms of that endorsement trump to the limited extent provided in the endorsement.[17] See, e.g., Yeates, 584 F.3d at 875-79; Carolina Cas. Ins. Co. v. Insurance Co. of North America, 595 F.2d at 134-138; Global Hawk Ins. Co. v. Le, 170 Cal. Rptr. 3d 403, 410-16 (Cal. Ct. App. 1st Dist. 2014) ("Global Hawk"); Roberson, 866 N.E.2d at 200-05.[18]

_____

[17] The exception with respect to the federally-prescribed endorsement is discussed in detail later.

[18] In Carolina Cas. Ins. Co. v. Insurance Co. of North America, the Third Circuit remarked:

(continued...)

Undoubtedly, it is because of the foregoing that National makes no argument that the federal regulatory scheme requires that its "statutory employee" definition be read into its Motor Carrier Coverage Form. Rather, National's argument is that the "statutory employee" definition should be read into its policy because, according to it, the policy was tailored to fit the federal regulatory scheme. Before turning to the reasons why the federal definition should not be read into National's Motor Carrier Coverage Form, the court will address first why Heinis likely was not a "statutory employee" under the federal definition at the time of the accident.

        **c.**        **Heinis likely was not a "statutory employee" of Avery under the federal definition even if it applied**

The federal regulatory definition of "employee" that National argues should be read into its policy is set forth in 49 C.F.R. § 390.5 and reads as follows:

> [A]ny individual, *other than an employer*, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (*including an independent contractor while in the course of operating a commercial motor vehicle*), a mechanic, and a freight handler.

---

[18](...continued)

While a lessee cannot free itself of its federally imposed duties when protection of the public is at stake, the federal requirements are not so radically intrusive as to absolve lessors or their insurers of otherwise existing obligations under applicable state tort law doctrines[31] or under contracts allocating financial risk among private parties.

595 F.2d at 138. Then, in an accompanying footnote, the Third Circuit further elaborated:

31. We are not concerned here with the preemption of state regulations of motor carriers engaged in interstate commerce. See e.g., Bailey v. Bruneau's Truck Service, Inc., 149 Conn. 46, 175 A.2d 372, 376 (1961). Whatever preemptive effect the ICC regulations may have in that limited field cannot form a basis for arguing that federal law also displaces state law doctrines governing master-servant relationships, Respondeat superior, contribution among tortfeasors, or even ordinary negligence. See, e.g., Simmons v. King, 478 F.2d 857, 867 (5th Cir. 1973); Continental Casualty Co. v. American Fidelity & Casualty Co., 275 F.2d 381, 383-84 (7th Cir. 1960); Vance Trucking Co. v. Canal Insurance Co., 249 F.Supp. 33, 39 (D.S.C. 1966), aff'd 395 F.2d 391 (4th Cir.), cert. denied, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968). Indeed, so massive a disruption of the tissue of state law would be extraordinary in the American legal framework. See P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 470-71 (2d ed. 1973).

Id. at 138 n. 31.

(italics added). Even if this definition could be read into National's Motor Carrier Coverage Form, it is unlikely that Heinis would have been a "statutory employee" of Avery at the time of the accident within the meaning of 49 C.F.R. § 390.5. The reason why requires some explanation given that this regulation has proved difficult to apply, in part because of the parenthetical in the second sentence containing the language "including an independent contractor while in the course of operating a commercial motor vehicle," a point that will be addressed first, and the "other than an employer" language in the first sentence, which will be addressed later.

A number of courts have read 49 C.F.R. § 390.5 to mean that an "independent contractor" is a statutory employee only while "operating" a commercial motor vehicle. <u>E.g.</u>, <u>Consumers County Mutual Ins. Co. v. P.W. & Sons Trucking, Inc.</u>, 307 F.3d 362 (5th Cir. 2002) ("<u>Consumers County</u>") (relief driver who was sleeping at time of accident was a driver "operating" a motor vehicle and a statutory employee); <u>Walker v. Transportation Intern. Movers, Inc.</u>, No. 06-3030, 2007 WL 4180692, at *4 (D. Or. Nov. 21, 2007) (independent contractor not a statutory employee because not driving/operating the equipment); <u>Pouliot v. Paul Arpin Van Lines, Inc.</u>, 292 F. Supp. 2d 374 (D. Conn. 2003) ("<u>Pouliot</u>") (concluding that independent-contractor lessor-owner who was unloading his trailer was not "operating" the motor vehicle because he was not driving and hence was not a statutory employee).[19] And, while there is a divergence of opinion in some of these cases as to what constitutes "operating" in terms of whether it applies only while the independent contractor is actually driving or whether it also extends to related activities, such as loading and unloading or being a relief driver who is not actually driving but supporting the operation by being on board, the analysis employed in these cases would likely not extend "operating" to the facts of

---

[19] In <u>Zimprich</u>, this reading of the regulation was conceded, so the North Dakota Supreme Court did not discuss its meaning further. 519 N.W.2d at 591.

this case where Heinis was merely standing by while the repair was being attempted on his trailer. See id. It is this line of cases that Great West relies upon for its argument that Heinis was not a "statutory employee" within the meaning of 49 C.F.R. § 390.5.

National responds that these cases rely upon a flawed reading of 49 C.F.R. § 390.5 and cites to Lancer Ins. Co. v. Newman Specialized Carriers, Inc., 903 F. Supp. 2d 1272 (N.D. Ala. 2012) ("Lancer") as a case where the court, according to it, properly construed the definition. In Lancer, an independent-contractor lessor-operator was injured while assisting with the unloading of his trailer, and one of the issues was whether he was a statutory employee of the lessee-carrier at the time. Id. at 1274. The Lancer court rejected the reasoning employed by the federal district court in Pouliot that an independent contractor must have been driving the motor vehicle to be a statutory employee, concluding that the unloading fell within the purview of operating the equipment. Id. at 1280. Then, after reaching this conclusion, the Lancer court offered an alternative grounds for its conclusion that the independent contractor was a statutory employee of the lessee-carrier, which is the one National relies upon here. The Lancer court stated it was wrong in applying § 390.5 to focus on the parenthetical in the second sentence, which suggests that an independent contractor becomes an employee while operating the equipment, and to ignore the "any individual . . . who in the course of his or her employment directly affects commercial motor vehicle safety" language of the first sentence. Id. The court then suggested, without much discussion, that any person directly affecting motor vehicle safety is a "statutory employee" based on the first sentence of § 390.5 and that the second sentence merely sets forth a non-exclusive list of examples. Id. In other words, under this reading of § 390.5, an independent contractor would be considered a "statutory employee" anytime he or she is employed by an employer and while in the course of employment "directly affects commercial motor vehicle safety" - not just when "operating a commercial motor vehicle." Id.

Applying this reading of § 390.5, National contends Heinis was a "statutory employee" of Avery for purposes of the underlying action because he directly affected "motor vehicle safety" when he failed to properly clean out the truck.[20]

While the <u>Lancer</u> court's reading of the regulation is a possible one, there would be no reason to add "while in the course of operating a commercial motor vehicle" to the parenthetical referencing an independent contractor if the only purpose of the parenthetical was to clarify that independent contractors are included in the definition of "employee" - a point made in several of the other cases cited above. In addition, the <u>Lancer</u> court's interpretation ignores the words "other than an employer" in the first sentence and the significance of this will become more apparent in a moment.

There does not appear to be any Eighth Circuit case law on point, and this court believes the Eighth Circuit would reject the <u>Lancer</u> court's reading of the regulation. Like the Fifth Circuit, the Eighth Circuit would likely look to the underlying statutory language for guidance in construing the regulation. <u>See</u>, <u>e.g.</u>, <u>Ooida Risk Retention Group, Inc. v. Williams</u>, 579 F.3d 469, 473-475 (5th Cir. 2009) ("<u>Ooida</u>") (looking to the statutory definition to resolve the uncertainty in the meaning of "employee" under 49 C.F.R. § 390.5).

In that regard, the statutory definition of "employee," upon which 49 C.F.R. § 390.5 is based, as well as the statutory definition of "employer" are as follows:

> (2) "employee" means an operator of a commercial motor vehicle (including an independent contractor when operating a commercial motor vehicle), a mechanic, a freight handler, or an individual not an employer, who–
>> (A) directly affects commercial motor vehicle safety in the course of employment; and

---

[20]    As noted earlier, National chastised Great West for failing to point to any federal safety regulation that was violated by Heinis operating a trailer that leaked only upon loading and unloading and not while operating on a public roadway. Here, National has failed to point to one federal motor carrier safety regulation that was implicated by Heinis failing to properly clean out the trailer. While the court rejects the <u>Lancer</u> court's reading of § 390.5 for the reasons discussed below, even if it applied, it likely would be of no help to National here.

(B) is not an employee of the United States Government, a State, or a political subdivision of a State acting in the course of the employment by the Government, a State, or a political subdivision of a State.

(3) "employer"--

(A) means a person engaged in a business affecting interstate commerce that owns or leases a commercial motor vehicle in connection with that business, or assigns an employee to operate it; but

(B) does not include the Government, a State, or a political subdivision of a State.

49 U.S.C. § 31132(2)-(3). The most straightforward reading of this statutory language is that an independent-contractor lessor-operator (like Heinis) would be an "employer," and, given that, would not be an "individual not an employer" under the definition of "employee." Rather, to be an "employee," Heinis would have to fall within one of the other three categories set forth in the definition of "employee" preceding the disjunctive use of "or" in 49 U.S.C. § 31132(2). E.g., Ooida, 579 F.3d at 474-75. And, in this case, Heinis would arguably not be a "statutory employee" of Avery at the time of the accident because he was neither "operating" the motor vehicle (even under an expansive meaning of the term to include loading or unloading or acting as relief driver) nor was he working as a "mechanic" or "freight handler."

> **d.      Even if Heinis was a "statutory employee" within the meaning of of 49 C.F.R. § 390.5, the North Dakota Supreme Court would not consider him an "employee" for purposes of coverage under National's Motor Carrier Coverage Form**

Even if the court is wrong and Heinis was a "statutory employee" within the meaning of 49 C.F.R. § 390.5 and the underlying statute, there remains the question of whether this "fictional" statutory definition, which is contrary to ordinary state and common law distinctions between an employee and an independent contractor, should be read into National's Motor Carrier Coverage Form with the result being that coverage is excluded under the "fellow employee" exclusion. Unlike construing the federal "statutory employee" definition, this is purely a question of state law since, as already discussed, the federal regulatory scheme has not preempted the field.

Before turning to the question of how the North Dakota courts are likely to read National's policy, it is necessary first to consider (1) the minimum requirements for financial responsibility that are imposed by federal law upon motor carriers transporting goods interstate, including the option of meeting those requirements by obtaining an MCS-90 endorsement, and (2) what the MCS-90 endorsement is and what it does. This is because the only thing that National points to as indicating that its policy was tailored to meet federal regulatory requirements, and for that reason should be read to include the federal "statutory employee" definition, is its inclusion of the MCS-90 endorsement.

### i. The federally-imposed requirements for financial responsibility and the MCS-90 endorsement

As noted earlier, one of things that Congress did to protect the public against judgment-proof operators was to impose minimum requirements for financial responsibility. Section 13906 of Title 49 requires that regulated motor carriers meet specified minimum requirements for financial responsibility in one of three ways to insure that judgments against them can be collected up to the minimum amounts. First, a carrier can obtain a federally-approved endorsement from a liability insurance carrier that provides the necessary protection to the public. Second, a carrier can obtain written guaranties from approved sureties that guarantee there will be a solvent party to stand behind any judgment if it cannot be collected from the carrier. Third, a carrier with sufficient resources and with government approval can self-insure. If a carrier chooses the option of obtaining an endorsement for the necessary protection from a private insurance carrier, the form of the endorsement is prescribed by 49 C.F.R. § 387.39 and is identified therein as MCS-90. See, e.g., Carolina Cas. Ins. Co. v. Yeates, 584 F.3d 868, 873-74 (10th Cir. 2009) ("Yeates"); Global Hawk, 170 Cal. Rptr. 3d at 410-12.

Even more relevant to the discussion here than the fact that not all carriers need to obtain an MCS-90 endorsement (since they can meet the minimum financial responsibility requirements in one of the two other ways), is what the form endorsement purports to do. The MCS-90 endorsement in this case mirrors language prescribed by 49 C.F.R. § 387.39 and reads, in relevant part, as follows:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. *However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company.* The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

(Doc. No. 29-5, p. 131) (italics added).

As indicated by the italicized language, the MCS-90 endorsement does not purport to limit the existing obligations between the insured and the insurance carrier. Rather, its purpose is to guarantee up to the limits of the endorsement that there will be a financially responsible party able to satisfy a judgment rendered against an insured "for public liability resulting from negligence in the operation, maintenance or use of [regulated] motor vehicles[,]" notwithstanding what, in some instances, may be limitations in the underlying policy. In fact, the endorsement is more in the nature of a guarantee than insurance, since it obligates the insured to reimburse the insurance carrier for any amounts it is required to pay beyond what is required by the underlying policy. See, e.g., Gramercy Ins. Co. v. Expeditor's Exp., Inc., __ Fed.Appx__, No. 13-6058, 2014 WL 3843836, at

46

**2-3 (6th Cir. Aug. 5, 2014) (unpublished opinion) ("Gramercy"); Yeates, 584 F.3d at 878-89;

Canal Ins. Co. v. Distribution Services, Inc., 320 F.3d 488, 490 (4th Cir. 2003) ("Canal"); Northland

Ins. Co. v. Rhodes, No. 09-cv-01691, 2010 WL 5110107, at *7 (D. Colo. Dec. 9, 2010)

("Northland"); Global Hawk, 170 Cal. Rptr. 3d at 410-12.

> ii. **The North Dakota Supreme Court would reject National's argument that the federal "statutory employee" definition applies to the "fellow employee" exclusion of its policy**

National cites to cases where courts have read into a motor carrier liability policy the

federally-created "statutory employee" definition and excluded coverage under a "fellow employee"

exclusion on the theory that the policies in question were designed around the federal motor carrier

requirements. See, e.g., Consumers County, 307 F.3d at 365-67; Lancer, 903 F. Supp. 2d at 1278-

81; United Financial Cas. Co. v. Abe Hershberger & Sons Trucking Ltd., No. 11AP-629, 2012 WL

457715 (Ohio Ct. App. Feb. 14, 2012). These cases offer little in the way of evidence of this point,

however, except, in some of the cases, to note the presence of an MCS-90 endorsement. See, e.g.,

Global Hawk, 170 Cal. Rptr. 3d at 415. Also, some give short-shrift to the actual policy language,

including whether there is anything evincing an intent to incorporate the "statutory employee"

definition.

Not surprisingly, there are a number of cases to the contrary, which National has ignored.

In these cases, the courts have expressed skepticism about importing federal requirements into

contracts tailored for the motor carrier industry, absent some expression of intent that the

requirements be incorporated, pointing to the fact that the federal motor carrier regulatory scheme

does not wholesale replace state and common law liabilities that the polices are also designed to

protect against and the fact the MCS-90 endorsement, given its limited purposes and "coverage,"

is hardly indicative of an intent to import federal requirements that would otherwise limit the

obligations of the insurer in the underlying policy.  See, e.g., Gramercy, 2014 WL 3843836, at **
2-3; Yeates, 584 F.3d at 878-79; Canal, 320 F.3d at 492-93; Northland, 2010 WL 5110107, at *7;
Global Hawk, 170 Cal. Rptr. 3d at 415; cf. Wellman v. Liberty Mut. Ins. Co., 496 F.2d 131, 137-39
(8th Cir. 1974); Simpkins v. Protective Ins. Co., 419 N.E.2d 557, 560  (Ill. App. Ct. 1st Dist. 1981)
("Simpkins").  This includes several cases that have expressly rejected reading into the underlying
policy the federal "statutory employee" definition and excluding coverage based on a "fellow
employee" exclusion.  Gramercy, 2014 WL 3843836, at **1-3; Northland, 2010 WL 5110107, at
*7; cf. Global Hawk , 170 Cal. Rptr. 3d at 409-16 (holding inapplicable exclusions for "worker's
compensation" and "employer's liability" for the same reasons).[21]

In addition, one of the leading cases that National relies upon for support for its position that
the federal "statutory employee" definition should be read into its policy is the Fifth Circuit's
decision in Consumers County.  However, in a more recent unpublished decision, the Fifth Circuit
has suggested that Consumers County may be distinguishable on the ground that the underlying
policy in that case did not define "employee" unlike National's policy here, which does define
"employee." Canal Indem. Co. v. Rapid Logistics, Inc., 514 Fed.Appx. 474, 477-78 (5th Cir. 2013)
(distinguishing Consumers County but deciding the case on other grounds); see Gramercy, 2014 WL
3843836, at *3 (discussing Canal Indem. Co. and its distinguishment of Consumers County).

In terms of this case, the court predicts the North Dakota Supreme Court would find cases
such as  Gramercy, Northland, and Global Hawk  to be the more persuasive and would conclude that

---

[21]  National points to the fact that many of the federal motor carrier regulations have been made a part of the
North Dakota's regulatory scheme, which regulates motor carriers operating intrastate, by reference in N.D. Admin. Code
§ 38-04-01-02.  National is unable, however, to point to anything in North Dakota's regulatory scheme which manifests
an intent that the incorporated regulations would be applied any differently under North Dakota law much less an intent
that they should be applied to alter the definition of an "employee" in a private insurance contract for coverage that is
beyond that required by the regulatory scheme.

the federal "statutory employee" definition should not be read into National's Motor Carrier Coverage Form (and thereby not bring into play the "fellow employee" exclusion) - since the coverage arises out of the underlying policy and not the "added" coverage by the MCS-90 endorsement. The reasons why include the following:

- First are the definitions of "employee" and "leased worker" under National's Motor Carrier Coverage Form as set forth earlier. The definition of "employee" specifically states that it includes a "leased worker" (which is separately defined) with no similar attempt being made to incorporate the "statutory employee" definition of 49 C.F.R. § 390.5, which is contrary to the generally accepted meaning of employee. Thus, not only is there absent any intent to incorporate the federal "statutory employee" definition," the fact that a "leased worker" was included and not a "statutory employee" suggests the intent was to the contrary. The court in <u>Northland</u> made this point, stating:

  > [T]he parties knew how to manifest their intent to incorporate various provisions of the federal statute and its regulations where applicable. Under the doctrine of *expressio unis est exclusio alterius*, the fact that they chose not to make specific reference to the expansive definition of "employee" set forth in 49 C.F.R. § 390.5 strongly suggests that the definition was not intended to be incorporated in the policy.

  <u>Northland</u>, 2010 WL 5110107, at *7.

- Second, just because National's policy has been tailored for the motor carrier industry where leased equipment and independent contractors are frequently used does not mean the parties necessarily intended to incorporate the federal "statutory employee" definition, which, as already discussed, was enacted for a limited purpose and does not always apply. In fact, as this case and <u>Zimprich</u> illustrate, Heinis and

Avery's other independent contractors are exposed to liability for acts that arise apart from operating the leased equipment on a public roadway. In obvious recognition of this fact, National's Motor Carrier Coverage Form is not limited to extending coverage for only when there may be an act for which imposition of the federal regulatory definitions might give rise to liability, but rather purports to provide what in substance is general liability coverage to Heinis as an added insured, so long as the leased equipment is being used in a manner that satisfies the other requirements of the Coverage Form. And, consistent with the policy providing general liability coverage, the "fellow employee" exclusion in National's Motor Carrier Coverage Form is a generic one and does include language limiting its application in the manner now suggested by National. See, e.g., Gear Automotive v. Acceptance Indem. Ins. Co., 709 F.3d 1259, 1262 (8th Cir. 2013); 46 C.J.S. Insurance § 1370 (database updated June 2014). Under these circumstances, to impose the fictional federal "statutory employee" definition to National's policy, with the result being it would apply in those instances where traditional law distinctions between independent contractors and employees are still applicable and have the effect of reducing the scope of National's coverage, would upset the expectations of the parties and truly be the "tail wagging the dog."[22]

_____

[22]  National contends that it is typical for operators such as Heinis to obtain "bobtail" insurance to cover the risks excluded by its policy. In making its argument for application of the "fellow employee" exclusion, National soft-pedals the fact that Great West's policy also contains a "fellow employee" exclusion, which is set forth in the next section and on its face would appear to foreclose coverage if the "statutory employee" definition was similarly read into its policy. (Doc. No. 25-4, p. 31). And, if the definition was read into both policies, Heinis would be without coverage for any liability arising out of Miller's action against him if the state court concluded Heinis was not a co-employee of Miller for purposes of that case, which this court views as the likely result. But, if the court is wrong and the state court does apply the "statutory employee" definition and bars the action against Heinis based on the immunity provided by

(continued...)

• Third, the MCS-90 endorsement does not evince an intent that the federal "statutory employee" definition be read into the underlying policy. As already explained, its purpose is limited to expanding the insurance carrier's obligations in certain instances to protect the public, and it expressly states it does not otherwise modify the underlying policy. As the Sixth Circuit succinctly observed in Gramercy:

> But the relevant language of the endorsement—"amend[s the contract] to assure compliance"—does not incorporate the Act's definition of employee into the contract. The endorsement instead acts as a form of extra insurance for the insurance contract. If the contract covers less than the Act requires, the endorsement amends the contract to comply with the Act. Yet here the contract covers more than the Act requires. The insurance contract uses a narrower definition of employee than the Act permits, so the contract covers more people (or excludes fewer people from coverage, take your pick). Nothing in the language of the endorsement suggests it operates to amend the more generous coverage in the insurance contract down to the minimum requirements of the Act.

2014 WL 3843836, at *2 (italics omitted); see also Yeates, 584 F.3d at 878-79 ("the MCS-90 endorsement operates only to protect the public and does not alter the relationship between the insured and the insurer as otherwise provided in the policy") (internal quotation marks and citing authority omitted).

• Fourth, are North Dakota's rules of construction of insurance policies. In addition to those set forth earlier, the North Dakota Supreme Court has stated:

> Exclusions from coverage in an insurance contract must be clear and explicit and are strictly construed against the insurer. [citations and quotation marks omitted]. Although a policy's exclusionary clauses are strictly construed, this Court will not rewrite a contract to impose liability on the insurer when the policy unambiguously precludes coverage. [citations omitted]

---

[22](...continued)
North Dakota's workers's compensation law (*i.e.*, N.D.C.C. § 65-01-08), then neither National nor Great West will have to provide indemnity.

K & L Homes, Inc. v. American Family Mut. Ins. Co., 2013 ND 57, ¶ 8, 829 N.W.2d 724. In this case, there is nothing in National's Motor Carrier Coverage Form which suggests that the term "employee" means anything more than how the term is commonly and typically understood and applied, much less an express incorporation of the fictional "statutory employee" definition. That being the case, the North Dakota Supreme Court would likely construe the "fellow employee" exclusion against National and conclude it does not apply without considering anything more than the plain language of the policy. See, e.g., Northland, 2010 WL 5110107, at *7; Global Hawk, 170 Cal. Rptr. 3d at 415; cf. Simpkins, 419 N.E.2d at 560 ("an insurance contract should not be interpreted with reference to ICC regulations, unless that contract so provides").

## IV. WHETHER GREAT WEST'S POLICY AFFORDS COVERAGE

### A. The policy language

The operative language from Great West's policy is the following:

**SECTION II – LIABILITY COVERAGE**

**A. COVERAGE**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto" only while:
1.     A covered "auto" is not used to carry property in any business; and
2.     A covered "auto" is not used in the business of anyone to whom the "auto" is rented, leased or loaned.

\* \* \* \*

We have the right and duty to defend any "insured" against a "suit" asking for such damages . . . However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage". . . to which this insurance does not apply.  \* \* \* \*

    \* \* \* \*

### B.        EXCLUSIONS

This insurance does not apply to any of the following:

**5.        FELLOW EMPLOYEE**
"Bodily injury" to any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business.

* * * *

**15.        TRUCKING OPERATIONS**
This insurance does not apply to:
a.        A covered "auto" while used to carry property in any business; or
b.        A covered "auto" while used in the business of anyone to whom the "auto" is rented, leased or loaned.

(Doc. No. 25-4, pp. 29-33).

### B.        Discussion

### 1.        What law applies

National takes the position that South Dakota law applies to the interpretation of Great West's policy because Heinis is a South Dakota resident and the policy was issued there. While that would likely be the result of the application of North Dakota's choice-of-law provisions in most cases construing contract language, see, e.g., Schleuter v. Northern Plains Ins. Co., Inc., 2009 ND 171, ¶¶ 11-14, 772 N.W.2d 879 ("Schleuter"), the court is not certain in this case given that almost all of the significant contacts are in North Dakota and the policies were obviously intended to provide complementary coverage. However, the point need not be decided because the result would be the same regardless of whether North Dakota or South Dakota law is applied.[23]

_____

[23] Under North Dakota law, the court would be required to consider all significant contacts in light of the five "Leflar" choice-influencing factors. E.g., Daley v. American States Preferred Ins. Co., 1998 ND 225, ¶¶ 6-17, 587 N.W.2d 159 (describing in detail the test and its history). What is somewhat unique about this case is that the lease agreement between Heinis and Avery required Avery to carry liability insurance covering the leased equipment and Heinis to obtain coverage for when the equipment would not be covered by the insurance procured by Avery with the expectation of the parties being that, for most cases of liability, at least one of the two insurances would provide coverage. Further, National and Great West would have been aware of these expectations as a general matter since it is common in the industry for the lessee-carrier to carry general liability insurance tailored for the trucking industry, such

(continued...)

## 2.     There is no coverage under Great West's policy

The court's earlier conclusion that the trailer was being used in Avery's business at the time of the accident necessarily leads to the conclusion there is no coverage under Great West's policy since it does not cover an "auto" (which includes by definition a trailer) when the covered auto is "used in the business of" anyone to whom it is "rented, leased, or loaned."  That is, unless the South Dakota courts would apply the "in the business of" language to the particular facts of this case differently.  National claims that they would based on the arguments it made earlier, but has not cited to any South Dakota cases deciding the issue, and, apparently, there are none.

In the alternative, National also argues that, regardless of how other courts have decided whether the "in the business of" language in Great West's policy is ambiguous, the South Dakota courts would (1) conclude the language is ambiguous, (2) resolve the ambiguity in favor of the insured, and (3) conclude Heinis has coverage under Great West's policy.  National then goes on to argue that Great West's coverage would be primary to any coverage of National that may be found by the court.

The court rejects these arguments.  First, there is nothing about the general rules that South Dakota applies to the construction of insurance polices which would suggest its courts would take a fundamentally different approach to deciding whether the language in question is ambiguous than the courts which have concluded that it is not.  See, e.g., Schleuter, 2009 ND 171 at ¶¶ 9-10

---

[23](...continued)
as provided by National, and for the lessor-operator to obtain "bobtail" coverage, such as provided by Great West.  Since it does not make a difference in this case, the court need not decide whether these points, when combined with the lease being subject to North Dakota law, National's policy being governed by North Dakota law, the accident occurring in North Dakota, and Great West's policy contemplating that any accident resulting in liability could easily occur outside South Dakota, given the transitory nature of the insured equipment, would be enough for a North Dakota court to simply resolve the disputes involving complementary coverages by looking only to North Dakota law.

(discussing the South Dakota cases); <u>State Farm Fire & Cas. Co. v. Harbert</u>, 2007 SD 107, ¶ 17, 741 N.W.2d 228 ("The existence of the rights and obligations of parties to an insurance contract are determined by the language of the contract, which must be construed according to the plain meaning of its terms.") (citation and quotation omitted). Second, while there appears to be no South Dakota cases on point, what the South Dakota Supreme Court has said in analogous cases suggests it would construe the "in business of" language the same way as this court has predicted the North Dakota Supreme Court would and also conclude the language is not ambiguous. <u>Cf.</u> <u>McGriff</u>, 436 N.W.2d at 861-63 (S.D. 1989) (concluding that the word "business" in a policy exclusion for "a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages" was not ambiguous because it clearly refers to a commercial enterprise or activity and that the court would not strain to find an ambiguity when none existed); <u>Sunshine Mut. Ins. Co. v. Addy</u>, 38 N.W.2d 406 (S.D. 1949) (concluding without any concern about ambiguity that the insured was operating his truck while engaged in the business of a commercial trucker under the particular facts of the case). Third, the court believes the South Dakota courts would find more persuasive the cases the court has relied upon in deciding how the North Dakota Supreme Court would decide the meaning of the "in the business of" language and the issue of ambiguity.

Consequently, the court concludes that Great West's policy does not extend coverage to Heinis for the underlying action brought against him by Avery's employee, Miller.

## V.   ORDER FOR JUDGMENT

Based on the foregoing, the court **GRANTS** Great West's motion for summary judgment (Doc. No. 18) and **DENIES** National's motion for summary judgment (Doc. No. 22). The court further **DECLARES** and **ADJUDGES** that defendant Heinis has coverage under National's policy

up to its limits for any liability arising out of the accident on June 18, 2011, which caused injury to

Avery's employee, Miller, and does not have coverage under Great West's policy.

**IT IS SO ORDERED.**

Dated this 9th day of October, 2014.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr., Magistrate Judge
United States District Court